UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | | |
|---|---|---|
| J. RICHARD RANSEL, Trustee of the Bankruptcy Estate of JOHN KAUFMAN, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 2:10-CV-466 JD |
| CRST LINCOLN SALES, INC., | ) ) | |
| Defendant. | ) | |

## OPINION AND ORDER

This is an employment action arising out of the termination of John Kaufman's employment as a driver with Defendant CRST Lincoln Sales, Inc., d/b/a CRST Dedicated Services. Now before the Court is Defendant CRST's Motion for Summary Judgment filed on June 10, 2013. [DE 61]. J. Richard Ransel, Trustee of the Bankruptcy Estate of John Kaufman, having been substituted as the plaintiff in this matter [DE 58], filed a response to the motion on July 26, 2013, [67] and Defendant replied on August 16, 2013. [71]. For the following reasons, Defendant's motion for summary judgment is GRANTED in part and DENIED in part.

### I. Factual Background

John Kaufman ("Kaufman") began working with CRST Dedicated Services, Inc., (hereinafter "CRST") driving a semi tractor-trailer on August 26, 2008. [DE 68-6 p. 2; DE 68-10]. Kaufman drove a flat-bed truck out of Burns Harbor, Indiana, and would make multiple stops each day picking up and delivering loads around the Chicago area. [DE 68-1 p. 13]. Kaufman's immediate supervisor and dispatcher was Curtis Bogard, the fleet manager, and Kaufman also reported to Steve Eichler, the terminal and account manager. [DE 68-1 p. 15].

Kaufman had good attendance, was on time for work, and received no write-ups or progressive discipline at CRST. [DE 68-2 pp. 33–34; DE 68-3 p. 18].

On May 20, 2010 Kaufman was involved in an accident while driving southbound on I-294 in Hinsdale, Illinois. [DE 68-5, -6]. The truck in front of him stopped abruptly when another car entered its lane and struck it, causing Kaufman to run into the back of the truck. [*Id.*]. The front of Kaufman's tractor was "smashed up," and the tractor lost all of its coolant fluid and had to be towed from the scene. [*Id.*; DE 68-1 p. 54] The Illinois State Police did not issue Kaufman a citation, but Kaufman called Mr. Eichler shortly after the accident and said that he had been driving at 65 miles per hour in a 55 zone, with his cruise control set, and that he had been following a second and a half behind the truck in front of him, which is less than the seven seconds mandated by CRST policy. [DE 68-1 pp. 69–70; DE 68-2 p. 16; DE 68-3 p. 22].

Kaufman suffered an injury to his back from the accident. Although he did not seek treatment at the time of his accident, he immediately notified CRST of his injury, consistent with CRST's workers' compensation policy that directs drivers to report any injury to its Workers' Compensation Department with 24 hours. [DE 68-1 p. 44; DE 68-4 p. 7]. CRST completed a "First Report of Injury" form documenting Kaufman's involvement in the accident and the injury to his middle and lower back. [DE 68-6]. On May 22, 2010, two days after the accident, Kaufman visited the emergency room at St. Joseph Hospital, where he was diagnosed with a strain or sprain and was prescribed medication. [DE 68-1 p. 45; DE 68-6 p. 2]. CRST's First Report of Injury form contains a notation dated May 22, 2010 that reflects Kaufman's visit to the hospital and his treatment. [DE 68-6 p. 2].

CRST's disciplinary policy states that certain conduct "may result in termination without prior warning," including a driver's involvement in a "Major DOT preventable accident." [DE

68-4 p. 4]. Mr. Eichler and his boss, Scott Knudsen, generally make the decision whether to terminate drivers at the Burns Harbor location, but CRST's safety department is involved as well when drivers are involved in accidents. [DE 68-2 p. 9]. At the time of Kaufman's accident, CRST's safety director was Randy Kopecky. [*Id.*]. A couple days after the accident, Kaufman spoke in person with Mr. Eichler, who told him, "We'll have you back to work in a couple days. We need to get this log review done, and we'll have you back to work. Your record is impeccable." [DE 68-1 p. 30; 68-2 p. 17].

Only two days later, however, on May 25, 2010, Mr. Eichler called Kaufman to a meeting, and with Mr. Kopecky on speaker phone, informed Kaufman that his employment was being terminated due to his involvement in the accident. [DE 68-1 pp. 32–33; DE 68-2 pp. 28–29]. Mr. Eichler also handed Kaufman a typed letter explaining that CRST's investigation determined that the accident was preventable, and that Kaufman's driving did "not demonstrate the professional driving ability required by CRST." [DE 68-7]. CRST asserts that Mr. Kopecky made the ultimate decision, though Mr. Eichler testified that he and Mr. Knudsen had input into the decision as well. [DE 68-2 pp. 17, 33].

At some point prior to his accident and termination, Kaufman had informed Mr. Eichler that he would need some time off in July 2010 to care for his wife. [DE 68-1 pp. 24–26]. Kaufman's wife suffered from COPD, Crohn's disease, and degenerative disk disease, and was also diagnosed with cancer in 2010. [DE 68-1 p. 10]. Kaufman kept Mr. Eichler up to date on those health issues, and he had previously taken days off of work to care for his wife, without incident or repercussion. [*Id.* pp. 21–25]. Kaufman's wife was scheduled to visit the Mayo Clinic in July 2010 for surgery and treatment of her cancer, Crohn's disease and degenerative disk disease. [*Id.* pp. 24–26]. Kaufman was unsure exactly how long they would be there, but

expected that it would be for at least a week. [*Id.*]. He therefore requested Family Medical Leave Act paperwork from Mr. Eichler, but he did not receive it prior to his discharge. [*Id.* pp. 24–26, 69, 73]. Kaufman and his wife were insured through CRST's health insurance plan. [DE 68-1 pp. 40–41]. They therefore lost their insurance coverage when Kaufman was discharged, but they continued to participate in CRST's plan by electing COBRA coverage. [DE 68-1 pp. 60–61].

Kaufman also applied for unemployment benefits following his discharge. He initially applied in Indiana, where he was based out of, but later learned that he needed to apply in Illinois, where CRST paid its unemployment tax. [DE 68-1 p. 58]. CRST contested Kaufman's claim, and the Illinois Department of Employment Security sent Kaufman a letter indicating that CRST had fired him "because he was absent." [DE 68-11]. Kaufman ultimately prevailed and received his unemployment benefits, but suffered financial hardship in the interim. [DE 68-1 pp. 58, 74].

## II.     Summary Judgment Standard of Review

On summary judgment, the burden is on the moving party to demonstrate that there "is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). That means that the Court must construe all facts in the light most favorable to the nonmoving party, making every legitimate inference and resolving every doubt in its favor. *Kerri v. Bd. of Trustees of Purdue Univ.*, 458 F.3d 620, 628 (7th Cir. 2006). A "material" fact is one identified by the substantive law as affecting the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A "genuine issue" exists with respect to any such material fact, and summary judgment is therefore inappropriate, when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. On the other hand, where a factual record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial. *Matsushita Elec. Indus. Co. v.*

4

*Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citing *Bank of Ariz. v. Cities Servs. Co.*, 391 U.S. 253, 289 (1968)).

In determining whether a genuine issue of material fact exists, this Court must construe all facts in the light most favorable to the non-moving party, as well as draw all reasonable and justifiable inferences in its favor. *King v. Preferred Technical Grp.*, 166 F.3d 887, 890 (7th Cir. 1999). Thus, in responding to Defendants' motion for summary judgment, the Court must credit Plaintiff's version of the facts. In so doing, the Court does not vouch for the truth of those facts, but merely uses them to determine whether a genuine issue for trial exists. *See Herzog v. Vill. of Winnetka*, 309 F.3d 1041, 1044–45 (7th Cir. 2002).

However, the non-moving party cannot simply rest on the allegations or denials contained in its pleadings, but must present sufficient evidence to show the existence of each element of its case on which it will bear the burden at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Robin v. Espo Eng'g Corp.*, 200 F.3d 1081, 1088 (7th Cir. 2000). Finally, the fact that the parties have cross-filed for summary judgment does not change the standard of review. *M.O. v. Ind. Dep't of Educ.*, 635 F.Supp.2d 847, 850 (N.D. Ind. 2009). Cross-motions are treated separately under the standards applicable to each. *McKinney v. Cadleway Properties, Inc.*, 548 F.3d 496, 504 n.4 (7th Cir. 2008).

### III. Discussion

Kaufman's complaint includes four counts. Count I asserts a claim for interference and retaliation in violation of the Family and Medical Leave Act of 1993. Count II asserts a violation of ERISA for interference with Kaufman's receipt of insurance benefits. Count III asserts a common law claim for retaliatory discharge, and Count IV asserts a violation of the Indiana Wage Claims Statute and the Indiana Wage Payment Statute for denied payment of earned wages. CRST has moved for summary judgment as to all counts. For the reasons that follow,

CRST's motion is GRANTED as to the ERISA claim and the wage claim (Counts II and IV), but is DENIED as to the FMLA and retaliatory discharge claims (Counts I and III).

A.   **FMLA Interference and Retaliation**

Kaufman's first claim is that CRST interfered with his exercise of rights under the Family and Medical Leave Act and retaliated against him by terminating his employment prior to his leave. The FMLA requires employers to afford eligible employees twelve workweeks of leave per twelve-month period in order to care for a relative who has a serious health condition. 29 U.S.C. § 2612(a)(1)(C); *Darst v. Interstate Brands Corp.*, 512 F.3d 903, 908 (7th Cir. 2008). The FMLA provides employees with two categories of claims in order to protect these rights: "those for interference and those for retaliation." *Shaffer v. Am. Med. Ass'n*, 662 F.3d 439, 443 (7th Cir. 2011). As to the former, the FMLA states that an employer may not "interfere with, restrain, or deny the exercise of or the attempt to exercise" any right provided under the FMLA. 29 U.S.C. § 2615(a)(1). As to the latter, the FMLA makes it "unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter," which courts have interpreted as protecting an employee who requests FMLA leave against discrimination. 29 U.S.C. § 2615(a)(2); *Shaffer*, 662 F.3d at 443; *Goelzer v. Sheboygan Cnty., Wis.*, 604 F.3d 987, 995 (7th Cir. 2010). The practical difference between a retaliation claim and an interference claim "is that the first 'requires proof of discriminatory or retaliatory intent while an interference theory requires only proof that the employer denied the employee his or her entitlements under the Act.'" *Shaffer*, 662 F.3d at 443 (quoting *Goelzer*, 604 F.3d at 993) (internal alterations omitted).

However, when a plaintiff asserts that their employer fired them in order to prevent them from taking FMLA leave, as Kaufman does, the distinction between interference and retaliation claims becomes considerably blurred. *Shaffer*, 662 F.3d at 443 (noting that the "interference and

retaliation claims . . . are closely linked" in this scenario). Though courts have recognized that "a termination may constitute a denial of benefits" so as to support an interference claim, *Nicholson v. Pulte Homes Corp.*, 690 F.3d 819, 828 (7th Cir. 2012), the FMLA does not guarantee continued employment where an individual would have been fired regardless of their request for FMLA leave. 29 U.S.C. § 2614(a)(3); *Goelzer*, 604 F.3d at 993. Thus, for a plaintiff to establish that their discharge prevented them from taking leave to which they are entitled—ostensibly an interference claim—they would have to show that their employer discharged them because of their request for leave, which mirrors the standard for a retaliation claim. *Shaffer*, 662 F.3d at 443; *Kauffman v. Fed. Express Corp.*, 426 F.3d 880, 885 (7th Cir. 2005) ("What is at stake here is a claim for wrongful discharge, and Kauffman may recover damages or equitable relief for that claim . . . on either an interference/entitlement or a discrimination/retaliation theory."); *see also Shreeve v. D.O. McComb & Sons, Inc.*, No. 1:12-cv-154, 2013 WL 5707196, at *4 (N.D. Ind. Oct. 21, 2013) (characterizing such a claim as "a retaliation claim masquerading as an interference claim").

The Seventh Circuit has recognized that in these circumstances, the dispositive question is the same as to both an interference and retaliation claim: "whether a reasonable jury could conclude that [the plaintiff's] exercise of his right to take FMLA leave was a motivating factor in the decision" to terminate his employment. *Shaffer*, 662 F.3d at 444; *see also Goelzer*, 604 F.3d at 993–96 (analyzing the interference and retaliation claims separately, but framing the question as to the interference claim as "whether the jury could find that the defendants did not reinstate [the plaintiff] because she exercised her right to take FMLA leave," which is the same standard under which it evaluated the retaliation claim). Accordingly, the Court will analyze Kaufman's interference and retaliation claims together, and Kaufman will need to establish that his exercise

of his right to take FMLA leave was a motivating factor in CRST's decision to terminate his employment in order to survive summary judgment.[1] *Shaffer*, 662 F.3d at 444.

Kaufman relies on a variety of circumstantial evidence to draw this connection, first citing the temporal proximity between his request for FMLA leave and his discharge. "Suspicious timing, together with other facts, can sometimes raise an inference of a causal connection." *Magyar v. Saint Joseph Reg'l Med. Ctr.*, 544 F.3d 766, 772 (7th Cir. 2008). Kaufman asserts in his brief that he requested his FMLA leave in May 2010, which would be the same month as his termination. Though the record is not clear as to when he actually made the request, Kaufman stated that he requested FMLA paperwork from Mr. Eichler "[t]owards the last portion of [his] employment," and this request presumably would have come sometime after March 2010, at which time Kaufman was aware that his wife would need treatment. [DE 68-1 pp. 25–27]. Construing these facts in the light most favorable to Kaufman, it is possible to infer that he requested FMLA leave within the last month of his employment, or at least relatively close thereto, which is a short enough time period to "reinforce an inference of retaliation." *Magyar*, 544 F.3d at 772. Further, it is undisputed that Kaufman was fired before the time he intended to take FMLA leave, so this timeline would be consistent with Kaufman's claim that CRST intended to deny him his right to take leave. Thus, although the timing here is not overly suspicious, it still provides some support to Kaufman's claim.

Kaufman also cites comparator evidence in order to draw a causal link between his FMLA leave and his firing. "All things being equal, if an employer takes an action against one

---

[1] It is unnecessary to consider whether Kaufman has satisfied the other predicates for an FMLA interference claim, as CRST has not disputed for the purposes of this motion that Kaufman was eligible for FMLA protection, that CRST was covered by the FMLA, that Kaufman was entitled to FMLA leave, and that he provided sufficient notice to CRST of his intent to take leave. [DE 61-1 p. 10].

employee in a protected class but not another outside that class, one can infer discrimination." *Perez v. Thorntons, Inc.*, 731 F.3d 699, 704 (7th Cir. 2013) (quoting *Filar v. Bd. of Educ. of City of Chicago*, 526 F.3d 1054, 1061 (7th Cir. 2008)); *Kasten v. Saint-Gobain Performance Plastics Corp.*, 703 F.3d 966, 973 (7th Cir. 2012) (noting that circumstantial evidence of retaliation includes "evidence that similarly situated employees were treated differently"). Kaufman identified a number of other drivers who were not fired after being involved in accidents, but only one of those, Ron Heaton, had been in a "major preventable accident," as had Kaufman. Accordingly, because comparators must be similarly situated "in all material respects," only Mr. Heaton could potentially qualify as a comparator for Kaufman. *Coleman v. Donahoe*, 667 F.3d 835, 846 (7th Cir. 2012).

CRST argues that despite being in a major preventable accident, Mr. Heaton is not comparable to Kaufman because Mr. Heaton was maintaining the proper speed and distance at the time of his accident. However, comparators must only have "engaged in similar—not identical—conduct to qualify as similarly situated," so "the critical question is whether [the employees] have engaged in conduct of comparable seriousness." *Id.* at 850–51; *Peirick v. Ind. Univ.-Purdue Univ. Indianapolis Athletics Dep't*, 510 F.3d 681, 691 (7th Cir. 2007) (finding that employees were similarly situated where even though they "did not engage in the exact same misconduct as alleged of [the plaintiff], they violated the very same rules"). Although the circumstances of Mr. Heaton's accident are not clear, CRST determined that he was involved in a major *preventable* accident, so it is possible to infer that the seriousness of his misconduct was similar enough to Kaufman's for him to qualify as a comparator, even if Mr. Heaton's accident was preventable for different reasons. Mr. Heaton is therefore similarly situated to Kaufman for these purposes.

In order to support an inference of discrimination on account of a plaintiff's membership in a protected class, though, comparators must not only be similarly situated to and have been treated differently than the plaintiff, they must be *outside the plaintiff's protected class*. *Perez*, 731 F.3d 704 ("All things being equal, if an employer takes an action against one employee in a protected class but not another *outside that class*, one can infer discrimination." (emphasis added)). Otherwise, there would be no reason to suspect that the protected class caused the disparity. Here, although Kaufman has identified a number of would-be comparators, he has not expressly indicated whether or not any of them belong to his protected classes. However, it is possible to infer from other materials in the record that Mr. Heaton had not requested FMLA leave. Specifically, Mr. Eichler testified that he has only had one driver request FMLA leave— Josh Thompson. [DE 68-2 pp. 26–27]. Because Mr. Heaton was also one of Mr. Eichler's drivers, it is possible to infer that Mr. Heaton had not requested FMLA leave, meaning that he was outside of Kaufman's protected class. [*Id.* p. 14]. Accordingly, Kaufman has identified a similarly situated employee outside of his protected class who was treated more favorably than he was, which further supports an inference of discrimination.

Finally, Kaufman cites several ways in which CRST's proffered reasons for terminating his employment could be considered pretextual. *See Simple v. Walgreen Co.*, 511 F.3d 668, 671 (7th Cir. 2007) (noting that a "finding of pretext can complete the prima facie case under *McDonnell Douglas,* but it can also be independent evidence of discrimination."). First, Kaufman has provided evidence that CRST's reasons for firing him have shifted, which can suggest that CRST was trying to cover up an improper motive. *Shaffer*, 662 F.3d at 445 (noting that a "jury could also look to the different explanations given at different times for [the plaintiff's] termination" as evidence of discrimination); *Simple*, 511 F.3d at 671 ("The

inconsistency is suggestive of pretext and thus is evidence of discrimination . . . ."). The only reason CRST offered for its action in Kaufman's termination letter was that his conduct relative to the accident did "not demonstrate the professional driving ability required by CRST." [DE 68-7]. However, it gave an entirely different reason to the Illinois Department of Employment Security, whose records state that Kaufman was discharged "because he was absent." [DE 68-11]. These reasons are plainly inconsistent, which suggests they are pretextual.

CRST's argument in its reply brief that it never actually said Kaufman was fired because he was absent fails for several reasons. First, the exhibits CRST attached in order to demonstrate that it did not make that statement were addressed to *Indiana's* unemployment insurance agency, even though it was *Illinois'* agency whose records said that CRST discharged Kaufman because he was absent.[2] Second, even if CRST denies having told the agency that it fired Kaufman because he was absent, that fact that the agency's records contain that explanation is enough to raise an inference that it did so; why would the agency think Kaufman had been fired for being absent unless CRST told it? Perhaps the agency confused "accident" with "absent," but Kaufman is entitled to the benefit of the doubt at this stage.

The second basis for finding pretext is the fact that CRST's second explanation for Kaufman's firing—his absence—is wholly unsupported by the record. Even Mr. Eichler, who concurred in the decision to terminate Kaufman's employment, stated that Kaufman was always on time and did not have any disciplinary problems, and there is no indication in the record that Kaufman ever had an unexcused absence. [DE 68-2 pp. 33–34]. This reason is therefore factually baseless, which establishes pretext, and further supports an inference of discrimination. *Nawrot*

---

[2] Kaufman initially filed his claim for unemployment benefits in Indiana, but later learned that he had to apply for benefits in Illinois because that was where CRST paid its unemployment tax. [DE 68-1 p. 58].

*v. CPC Int'l*, 277 F.3d 896, 906 (7th Cir. 2002) (noting that "a plaintiff may show pretext by presenting evidence tending to prove that the employer's proffered reasons are factually baseless").

Combining all of this circumstantial evidence, including the suspicious timing, CRST's disparate treatment of similarly situated employees who had not requested FMLA leave, and its pretextual reasons for terminating Kaufman's employment, a jury could reasonably infer that CRST fired Kaufman because of his request for FMLA leave. CRST's attempt to defeat this inference by arguing that its decision-makers were unaware of Kaufman's request for FMLA leave is unavailing, as it is unsupported by the record. CRST claims that only Mr. Kopecky made the decision to fire Kaufman and that he was unaware of Kaufman's wife's condition. However, CRST's contention that "the undisputed facts show that Kopecky made the ultimate decision to terminate Kaufman" is directly contradicted by the testimony of Mr. Eichler, who expressly stated that he "had input into the decision." [DE 71 p. 4; DE 68-2 p. 33]. There is clearly evidence that Mr. Eichler was aware of Kaufman's FMLA request, so this argument fails to break the causal chain. Therefore, CRST's motion for summary judgment must be DENIED as to Count I.

**B.     ERISA Interference**

In Count II, Kaufman asserts that CRST terminated his employment so that CRST would not be responsible for his and his wife's future medical expenses, in violation of the Employee Retirement Income Security Act ("ERISA"). Under § 510 of ERISA, it is "unlawful for any person to discharge . . . a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan." 29 U.S.C. § 1140. "Nevertheless, an employee's loss of benefits due to an adverse employment action does not automatically amount

12

to a violation of § 510." *Turner v. Health Care Serv. Corp.*, No. 06 C 2399, 2009 WL 1210624, at *16 (N.D. Ill. May 4, 2009) (citing *Isbell v. Allstate Ins. Co.*, 418 F.3d 788 (7th Cir. 2005)). Rather, "The employer must have the specific intent to deprive an employee of his plan rights." *Isbell*, 418 F.3d at 796; *Lindemann v. Mobil Oil Corp.*, 141 F.3d 290, 295 (7th Cir. 1996).

To establish a violation of § 510, a plaintiff can rely on either the direct or indirect methods of proof. *Isbell*, 418 F.3d at 796. Under the indirect method, on which Kaufman relies, a plaintiff must first make out a prima facie case by showing that he (1) belonged to the protected class; (2) was qualified for his position; and (3) was discharged "under circumstances that provide some basis for believing that the prohibited intent to retaliate or to prevent the use of benefits was present." *Id.* (internal quotation omitted); *Little v. Cox's Supermarkets*, 71 F.3d 637, 642 (7th Cir. 1995). The burden would then shift to CRST to articulate a "legitimate, nondiscriminatory reason for its action," which Kaufman would then need to rebut as pretextual. *Isbell*, 418 F.3d at 796.

Here, CRST disputes only the third element of the prima facie case, and the Court agrees that Kaufman has failed to present any evidence suggesting that he was fired because CRST intended to deprive him of his insurance benefits. Kaufman argues that CRST knew that his wife would soon be undergoing expensive medical treatment, so it terminated his employment so that its insurance plan would not have to cover those costs. However, Kaufman has not produced any evidence that supports this speculation. First, even though Kaufman's superiors were aware of his wife's condition, there is no evidence in the record indicating that they knew she was insured through Kaufman by CRST's insurance plan. If the decision-makers did not even know that Kaufman's wife was insured under CRST's plan, Kaufman can hardly argue that they fired him in order to deprive him of those benefits. Further, there is no evidence in the record as to how

much the treatment would have cost or, more importantly, what impact, if any, that would have had on CRTS's insurance premiums and costs. Where the only basis for Kaufman's claim is the assertion that CRST was trying to engage in cost-cutting, the absence of this information that would support such a motive is all but fatal to his claim. *Little*, 71 F.3d at 643–44 (dismissing an ERISA interference claim where the relationship between the plaintiff's insurance claims and the employer's premiums was too attenuated to support an inference of discriminatory intent); *Turner*, 2009 WL 1210624, at *16 (holding that a plaintiff's ERISA interference claim, which was predicated on the assertion that "her employer knew that she had a back problem and thus had a cost-cutting motive for terminating her employment," was "based on pure speculation").

The availability of COBRA benefits further attenuates any cost-cutting motive CRST may have had. Kaufman and his wife had the right under COBRA to continue to participate in CRST's insurance plan for at least 18 months following his separation from CRST, so the only benefit CRST would have likely realized during that period would be its share of their premiums (the amount of which is also absent from the record). *Gaskins v. Rock-Tenn Corp.*, No. 1:12cv192, 2013 WL 5964394, at *9 (S.D. Ohio Nov. 8, 2013) (granting summary judgment on an ERISA claim where the "Plaintiff's right to COBRA coverage meant that Defendant remained potentially liable for the costs of the transplant long after [Plaintiff's] termination, and would benefit only so far as the company would not be required to pay its share of the premiums for coverage"). CRST may have theoretically hoped that Kaufman would decline COBRA coverage (which would be unlikely in the case of someone who needed expensive medical treatment) or that he would find other employment through which he could receive health benefits, but that is too speculative to support Kaufman's claim. Finally, Kaufman has no comparator evidence as to his ERISA claim so as to suggest that his receipt of insurance benefits may have played a role in

14

his discharge. Unlike the FMLA claim, where the record at least implied that Kaufman's only similarly-situated comparator was outside of his protected class, there is no indication in the record as to whether or not Mr. Heaton made or was going to make insurance claims similar to Kaufman's. Thus, the fact that CRST treated Kaufman and Mr. Heaton differently offers no evidence that the disparity was on account of Kaufman's receipt of insurance benefits.

The Court therefore concludes that Kaufman has failed to establish the third element of the prima facie case, that the circumstances of his discharge give some basis to infer that it was based on an unlawful intent to prevent his receipt of benefits. Accordingly, it is unnecessary to proceed to the next steps of the burden-shifting framework, so it is immaterial that CRST's proffered reasons may have been pretextual. As a result, the Court GRANTS summary judgment as to Count II.

## C.     Retaliatory Discharge

Kaufman next asserts a retaliatory discharge claim, arguing that CRST terminated his employment in retaliation for his claim for workers' compensation benefits following his accident. The Indiana Supreme Court has recognized a common law claim for wrongful discharge in violation of public policy when an employee is discharged merely for exercising their right to file a workers' compensation claim. *Frampton v. Central Ind. Gas Co.*, 260 Ind. 249, 252 (1973). This is a narrow exception to the employment-at-will doctrine. *Id.*; *Malone v. Wal-Mart Stores, Inc.*, 20 F. App'x 547, 549 (7th Cir. 2001). In order to survive summary judgment on this claim, Kaufman needs to establish a causal nexus between his termination and the worker's compensation claim that he filed or expressed an intent to file. *Malone*, 20 F. App'x at 549–50. In analyzing this issue, Indiana courts particularly look to "proximity in time between the filing of the claim and the termination" and "evidence that the employer's asserted

lawful reason for the discharge is a pretext." *Hudson v. Wal-Mart Stores, Inc.*, 412 F.3d 781, 785 (7th Cir. 2005).

Here, CRST terminated Kaufman's employment within days of his accident, and before allowing him to return to work, which is an adequately small proximity in time to support his claim. *Malone*, 20 F. App'x at 550 (holding that a four-month span between the plaintiff's claim and his discharge did not preclude an inference of retaliation); *Markley Enters. Inc. v. Grover*, 716 N.E.2d 559, 565 (Ind. Ct. App. 1999) (holding that a six-month span between the plaintiff's claim and his discharge "sufficed when the other evidence before the court calls into doubt the employer's reasons for discharge"). Further, as discussed *supra*, Kaufman has provided ample evidence from which a jury could conclude that CRST's reasons for his discharge were pretextual. The question thus boils down to whether Kaufman had sufficiently stated his intent to file a worker's compensation claim at the time of his discharge. CRST asserts that Kaufman did not actually file a worker's compensation claim until May 28, 2010, several days after his discharge. In response, Kaufman argues that he filed his claim on May 20, 2010, the day of his accident, and that at the very least, CRST knew that he intended to file a claim by the time it fired him.

Viewing the facts in the light most favorable to Kaufman for the purposes of summary judgment, the Court concludes that CRST was at least on sufficient notice that Kaufman would file a worker's compensation claim so as to support a retaliatory discharge claim. A plaintiff does not need to have already filed a worker's compensation claim at the time of their discharge in order to maintain a claim for retaliatory discharge. *Stivers v. Stevens*, 581 N.E.2d 1253, 1254 (Ind. Ct. App. 1991). As Indiana Court of Appeals recognized in *Stivers*:

> [O]ne of the reasons for the *Frampton* rule is to prevent the employer from terminating the employment of one employee in a manner which sends a message

16

> to other employees that they will lose their job if they exercise their right to worker's compensation benefits. Terminating an employee for filing a claim obviously has a deleterious effect on the exercise of this important statutory right. The discharge of an employee merely for suggesting she might file a claim has an even stronger deleterious effect.

*Id.* The Seventh Circuit echoed this logic in *Hudson*, noting that *Frampton's* "rationale is broad enough to cover plaintiffs . . . who have at least informed their employer of an intent to file a claim prior to being discharged." 412 F.3d at 785–86. The court in *Hudson* therefore held that an employee who had not yet filed a claim for workers' compensation benefits, but who had contacted the personnel manager to ask how to do so, could bring a retaliatory discharge claim. *Id.*; *see also Cleveland v. Maple Leaf Farms, Inc.*, No 1:10-cv-305, 2012 WL 2064529, at *7 (N.D. Ind. June 7, 2012) (noting that the plaintiff had to provide "evidence that would indicate [his employer] should reasonably have been expected to think that [he] intended to file a claim" in order to bring a *Frampton* claim).

Here, Kaufman notified CRST on May 20, 2010 that he was involved in an accident. [DE 68-1 p. 44; DE 68-6]. CRST knew that the accident occurred on a highway at 60 to 65 miles per hour, and it even termed the accident "major." [DE 68-7]. The decision-makers were clearly aware of the accident and its circumstances, as they cited it as the reason for Kaufman's discharge. [*Id.*] Kaufman also advised CRST of his injury on May 20, 2010, and CRST completed a document on that date entitled "CRST First Report of Injury," which indicates that Kaufman suffered injuries to his middle and lower back. [DE 68-6]. This document also has a checkmark next to "Lost Time," and contains a notation dated May 22, 2010, indicating that Kaufman had received treatment at St. Joseph Hospital. [*Id.*] A related form identified May 20, 2010 as the "Date Employer Had Knowledge of the Injury." [*Id.* p. 4]. In addition, a document entitled "First Incident Report," dated May 20, 2010, has a checkmark in a box indicating "Employee Injury." [*Id.* p. 5].

This evidence clearly shows that CRST was aware that Kaufman was injured on the job and had sought treatment prior to his termination, and the fact that it documented the injury in this manner suggests it understood the injury would result in a worker's compensation claim. This is much more comparable to *Hudson*, where the employee satisfied this requirement merely by asking a personnel manager how to file for workers' compensation benefits, than *Cleveland*, for example, where the employer could not have been expected to think that the employee intended to file a claim where he had merely tripped and skinned his arm, and had indicated that he was otherwise perfectly fine. *Hudson*, 412 F.3d at 785–86; *Cleveland*, 2012 WL 2064529, at *7. These circumstances thus implicate *Frampton's* rationale of protecting employees against retaliation for making such claims, so Kaufman can proceed on his retaliatory discharge theory. *See Hudson*, 412 F.3d at 786 ("Otherwise, an employer could avoid the dictates of *Frampton* and the Indiana Workman's Compensation Statute by preemptively terminating employees as soon as it caught wind that an injured employee was considering a claim."). Accordingly, CRST's motion for summary judgment is DENIED as to Count III.

### D.      Indiana Wage Claims Statute

Kaufman finally claims that CRST violated the Indiana Wage Claims Statute by failing to pay him for all of the vacation days that he had accrued as of the time his employment terminated. The Indiana Wage Claims Statute requires employers to pay "the unpaid wages or compensation" of any discharged employee at the "regular pay day for [the] pay period in which separation occurred." Ind. Code § 22-2-9-2(a). Kaufman acknowledges that CRST paid him for two vacation days in his final paycheck, but he contends in his complaint that he had a balance of four days of vacation at that time. [DE 33 ¶ 86]. CRST disagrees, asserting that Kaufman only had two days of vacation remaining at the time of his discharge. Kaufman did not respond to CRST's motion for summary judgment regarding this claim, nor did he dispute any of CRST's

facts with respect to this claim. Pursuant to Rule 56(e)(3), if a party fails to properly address another party's assertion of fact as required by Rule 56(c), then the Court may grant summary judgment if the movant is entitled to it. Fed. R. Civ. P. 56(e)(3).

According to CRST's benefits policy, employees earn five vacation days after one year of employment and ten vacation days after two years of employment. [DE 61-2 p. 72]. The vacation days accrue on the anniversary of the employee's start date, not at the beginning of the calendar year. [*Id.* p. 32; DE 68-3 pp. 41–42]. Here, it is undisputed that Kaufman was hired on August 26, 2008. Thus, on August 26, 2009, the first anniversary of his start date, Kaufman accrued five days of paid vacation. It is also undisputed that Kaufman used three of those vacation days—two in December 2009, and one in January 2010—leaving him two vacation days as of May 25, 2010. [DE 61-2 pp. 98–101]. CRST paid Kaufman for those two days of vacation in the pay period following his termination, so it fulfilled its obligations under the Indiana Wage Claims Statute. [*Id.* p. 102]. The Court therefore GRANTS summary judgment on Count IV.

## IV.  Conclusion

For the foregoing reasons, Defendant's motion for summary judgment [DE 61] is GRANTED in part and DENIED in part. Summary judgment is GRANTED as to the ERISA claim and the wage claim (Counts II and IV), but is DENIED as to the FMLA and retaliatory discharge claims (Counts I and III).

SO ORDERED.

ENTERED:  March 24, 2014

/s/ JON E. DEGUILIO
Judge
United States District Court